1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   YVETTE DANIELS, MARIA AGUILAR        No.  2:10-cv-00003-MCE-AC
     and KAREN CURRIE, individually and
12   on behalf of all persons similarly
     situated,
13                                        **MEMORANDUM AND ORDER**
                        Plaintiffs,
14
          v.
15
     CALIFORNIA DEPARTMENT OF
16   CORRECTIONS AND
     REHABILITATION,
17
                        Defendant.
18

19

20          Through the present action, the three named Plaintiffs, all of whom worked as

21   correctional officers, allege they were subjected to a hostile work environment by their

22   employer, Defendant California Department of Corrections and Rehabilitation ("CDCR").

23   Plaintiffs attribute that environment to the CDCR's alleged failure to properly enforce

24   policies prohibiting the possession and display of sexual materials by inmates.

25   According to Plaintiffs, the CDCR's failure in that regard violates Title VII of the Civil

26   Rights Act of 1964, 42 U.S.C. § 2000e, et seq.  All three Plaintiffs assert claims for

27   gender discrimination premised on the allegedly hostile work environment to which they

28   claim to have been subjected.

1

1  In addition, Plaintiff Yvette Daniels asserts a second cause of action for retaliation,

2  alleging she was subject to unwarranted discipline and other punitive measure for

3  complaining about the inappropriate sexual material.

4      While all three Plaintiffs worked as correctional officers in some capacity for

5  CDCR, they were employed at different locations and under different supervisory

6  authority.  CDCR separately moved for summary judgment as to all three Plaintiffs, and

7  the Court has already granted summary judgment as to Plaintiffs Aguilar and Currie.

8  That leaves Yvette Daniels as the only remaining Plaintiff.  The CDCR has moved for

9  summary judgment as to Ms. Daniels' Complaint on grounds that any exposure on her

10  part to sexual materials was not sufficiently severe and pervasive to constitute a hostile

11  work environment.  Alternatively, CDCR argues that even if inmate possession and/or

12  display of such materials did create the requisite hostile environment for Ms. Daniels, it

13  cannot be liable in any event because it took appropriate corrective actions to deter and

14  cease both the possession of sexually explicit materials and the display of sexually

15  suggestive materials by inmates.  Additionally, with respect to Ms. Daniels' retaliation

16  claim, CDCR argues that in the absence of any adverse employment action she cannot

17  present a viable claim.  CDCR alternatively asks that summary adjudication be granted

18  as to one or the other of Plaintiff's claims in the event the Court declines to grant

19  summary judgment as tto her allegations in their entirety. As set forth below, CDCR's

20  Motion as to Plaintiff Daniels will be denied.

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///\

27  ///

28  ///

2

1

2                                    **BACKGROUND**[1]

3

4        Plaintiff Yvette Daniels ("Plaintiff") has been employed by the CDCR since 1994.

5   Def.'s Undisputed Fact ("DUF") No. 1.  Since 2003, she has worked as a youth

6   correctional counselor at the N.A. Chaderjian Youth Correctional Facility ("CHAD") in

7   Stockton, California.  CHAD is a facility for run by CDCR for male youthful  offenders.

8   During 2007, Plaintiff was assigned to CHAD's San Joaquin Hall.  Id. at No. 3.  Mark

9   Miranda began to work at CHAD on or about June 19, 2007 as a Senior Youth

10  Correctional Counsel ("SYCC"), and in that position was Ms. Daniel's direct supervisor

11  between approximately June and August of 2007.  Id. at No. 22-23.  Plaintiff concedes

12  that the facts of her Complaint center around events that occurred during that time.  Pl.'s

13  Opp'n, 1: 13-14.  Plaintiff was the only female staff working at the San Joaquin hall

14  during this period.  Pl.'s Decl., 3:21-23.

15       Plaintiff claims that shortly after his arrival at CHAD, Mr. Miranda and his boss,

16  Treatment Team Supervisor Rich Alvarado, began allowing inmates access to both

17  sexually explicit magazines and video games with inappropriate sexual and/or violent

18  content.  Plaintiff contends that there had been no similar proliferation of such materials

19  at CHAD beforehand.  Significantly, according to Plaintiff, a number of the magazines in

20  question, including "Maxim" and "Black Men," had already been deemed sexually explicit

21  by a CDCR memorandum dating from 2005 and were therefore considered contraband.

22  Id. at 2:10-12.

23  ///

24  ///

25  ///

26  _____

27       [1] The Court notes that CDCR has objected to various items of evidence submitted on Plaintiff's
    behalf in opposition to this motion.  To the extent this section refers to evidence that was subject to those
    objections, the objections are overruled.  Because any remaining objections were not germane to the
28  Court's decision herein, the Court need not specifically rule on those objections and declines to do so.

1    It is undisputed that CDCR has regulations[2] and policies which prohibit the open

2    display of sexually oriented materials, and prohibit the possession of any sexually

3    explicit materials whatsoever as "contraband."  Sexually explicit materials are defined by

4    CDCR regulations as including materials depicting explicit sexual activity, frontal nudity,

5    and any materials that cannot be sold to minors.  DUF Nos. 9-12.  While CDCR claims

6    that sexually oriented materials could be possessed if only subject to private review,

7    Plaintiff Daniels claimed to be unaware of this distinction between the treatment of

8    sexually explicit and sexually oriented materials.  Pl.'s Decl., 2:13-14.  She believed she

9    had the discretion, however, to remove anything she deemed inappropriate.  DUF 20.

10   She further believed that inmates were subject to discipline, also at her discretion, if they

11   failed to refrain from viewing pornographic material.  Options for progressive discipline

12   included oral counseling along with a more formal written Behavior Report.

13   When confronted by Plaintiff about the pornographic magazines circulating on the

14   ward, several inmates told her that Mark Miranda and/or Rich Alvarado had in fact

15   approved the materials.  In a Behavior Report prepared by Plaintiff on August 9, 2007,

16   the ward in question told Plaintiff that Miranda had "allowed him to have the magazine."

17   Another Behavior Report prepared the same day reports the inmate as reporting that his

18   magazine had been "approved" by both Miranda and Alvarado.  Several days earlier, on

19   August 4, 2007, yet another behavioral report prepared by Plaintiff indicates the ward as

20   stating that Miranda "knew about the magazine and approved it."  The Report goes on to

21   state that yet another inmate approached Plaintiff thereafter and told her that the

22   "Maxim" magazine she had confiscated had in fact been his and that "Miranda gave it to

23   him."[3]  This prompted Plaintiff to send an email to Miranda questioning his approval of

24   the magazine since it included pictures of "a woman's bald crotch and full breast shots."

25   _____

26   [2] CDCR has requested that this Court take judicial notice, pursuant to Federal Rule of Evidence 201, of certain sections of the California Code of Regulations pertaining to this matter. That request is unopposed and is granted.

27   [3] The above-described Behavior Reports are attached as Exhibit B to Plaintiff's Declaration. Because they were prepared by Plaintiff in the ordinary course of business, the Court finds them

28   admissible under the business records exception to the hearsay rule.  See Fed. R. Evid. 803(6).

4

1  See Pl.'s Decl, Ex. C.

2      Beginning on August 7, 2007, Plaintiff made at least five written complaints

3  concerning the pornography and other inappropriate materials she believed were

4  permeating the workplace.  Plaintiff herself estimates that she lodged some 15

5  complaints.  Opp'n, p. 15.  On August 7th, Plaintiff scheduled a meeting with

6  Superintendent Umeda after claiming she attempted to talk with Rich Alvarado about the

7  issue to no avail.  On the morning of August 7, 2007, just prior to her meeting with

8  Umeda, Mark Miranda presented her with a Work Improvement Discussion memo dated

9  the day beforehand, complaining that Plaintiff had circumvented the appropriate chain of

10  command.  Plaintiff refused to sign the form. Pl.'s Decl., 4:18-21.  Moreover, Plaintiff

11  claims she later learned that Miranda had placed another disciplinary memo into her file

12  dated August 1, 2007.  She states that Miranda falsely claimed to have discussed that

13  memorandum with her when he had in fact not done so.  Plaintiff believes both the

14  August 1, 2007 and August 6, 2007 memos were prepared in retaliation for Plaintiff

15  having protested the proliferation of sexual imagery at CHAD.  According to Plaintiff,

16  during fourteen previous years of service at CDCR she had never previously been

17  subject to any kind of adverse employment action.  Id. at 7:8-9.

18      Following Plaintiff's meeting with Superintendent Umeda, Umeda did issue a

19  memorandum to staff addressing the propriety of video games in the youth ward.  See

20  Ex. 12 to Pl.'s Dep.  Plaintiff nonetheless claims that when she returned to work the

21  following day, the games in question were still present, and that she herself had to take

22  action to remove them from circulation   Pl.'s Statement of Disputed Facts ("PDF") Nos.

23  40-41.  Additionally, because Umeda's memorandum only addressed the videos, the

24  objectionable pornographic images still persisted.  No effort was made to remove those

25  images, which accounted for subsequent complaints tendered by Plaintiff through at

26  least August 15, 2013. There was also no training offered as to the propriety of sexually

27  oriented and/or explicit images.  Pl.'s Decl., 5:13-18.

28  ///

1    According to Plaintiff, multiple wards confronted her and questioned her authority

2    when she confiscated their sexually explicit magazines. Id. at 3:12-16.  Plaintiff alleges

3    that one inmate in particular became confrontational, and even threatening, when she

4    attempted to take his magazine away.  In her August 16, 2007 complaint to Umeda

5    (attached as Ex. 16 to Plaintiff's Deposition, as offered in Ex. A to defense counsel Amy

6    Lindsey-Doyle's Declaration), Plaintiff recounted an inmate as having told Plaintiff that,

7    according to her second-level supervisor, Rich Alvarado, Plaintiff was the only one with

8    any problem concerning sexual images.  The inmate in question, a former gang

9    member, became increasingly agitated during his conversation with Plaintiff.  By

10   Alvarado telling inmates that Plaintiff was the only one who questioned the propriety of

11   sexually related magazines,  Plaintiff believes she was being set up to be assaulted.  As

12   Plaintiff stated in her August 16th complaint:

13          As a line staff, I should be able to expect my supervisors not
             to place my life in jeopardy by giving wards/violators
14          information that could lead to my being attacked.

15   Id.

16       In addition to allegedly goading inmates' ire as indicated above, Plaintiff further

17   claims her supervisors engaged in other actions designed to undermine her authority.

18   On August 14, 2007, Plaintiff complained to Umeda that she was humiliated by Mark

19   Miranda's repeated reference to her as a"fat girl" in front of other inmates.  Id. at Ex. 13.

20       Mark Miranda was ultimately removed as Plaintiff's direct supervisor later in

21   August, 2007.  Following Miranda's departure from the unit, Plaintiff claims she had no

22   further problems in enforcing the regulations and policies regarding ward possession

23   and display of sexual materials.  DUF No. 54.  Additionally, in late September of 2007,

24   Superintendent Umeda removed the Work Improvement Discussion memos placed by

25   Miranda in Plaintiff's personnel file.  DUF No. 57.  Plaintiff  complained in October of

26   2007, however, that Rich Alvarado had purposefully deleted behavior reports concerning

27   her confiscation of sexual materials for wards.  Alvarado was not transferred from

28   Plaintiff's unit despite her request that he be moved.

1    This lawsuit was originally instituted as a class action in 2010.  Once the class

2    action allegations were dropped from this matter in 2011, its prosecution was left to the

3    named Plaintiffs on their own behalf.  As indicated above, the claims of the other two

4    named Plaintiffs, Karen Currie and Maria Aguilar, have already been resolved in CDCR's

5    favor through summary judgment.

6

7                                    **STANDARD**

8

9    The Federal Rules of Civil Procedure provide for summary judgment when "the

10   movant shows that there is no genuine dispute as to any material fact and the movant is

11   entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v.

12   Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to

13   dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

14   Rule 56 also allows a court to grant summary judgment on part of a claim or

15   defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may

16   move for summary judgment, identifying each claim or defense—or the part of each

17   claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v.

18   Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a

19   motion for partial summary judgment is the same as that which applies to a motion for

20   summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic

21   Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary

22   judgment standard to motion for summary adjudication).

23   In a summary judgment motion, the moving party always bears the initial

24   responsibility of informing the court of the basis for the motion and identifying the

25   portions in the record "which it believes demonstrate the absence of a genuine issue of

26   material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial

27   responsibility, the burden then shifts to the opposing party to establish that a genuine

28   issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith

7

1 | Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.

2 | 253, 288-89 (1968).

3 |     In attempting to establish the existence or non-existence of a genuine factual

4 | dispute, the party must support its assertion by "citing to particular parts of materials in

5 | the record, including depositions, documents, electronically stored information,

6 | affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

7 | not establish the absence or presence of a genuine dispute, or that an adverse party

8 | cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The

9 | opposing party must demonstrate that the fact in contention is material, i.e., a fact that

10 | might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby,

11 | Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and

12 | Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  The opposing party must also

13 | demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is

14 | such that a reasonable jury could return a verdict for the nonmoving party."  Anderson,

15 | 477 U.S. at 248.  In other words, the judge needs to answer the preliminary question

16 | before the evidence is left to the jury of "not whether there is literally no evidence, but

17 | whether there is any upon which a jury could properly proceed to find a verdict for the

18 | party producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251

19 | (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).

20 | As the Supreme Court explained, "[w]hen the moving party has carried its burden under

21 | Rule [56(a)], its opponent must do more than simply show that there is some

22 | metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  Therefore,

23 | "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

24 | nonmoving party, there is no 'genuine issue for trial.'"  Id. at 587.

25 |     In resolving a summary judgment motion, the evidence of the opposing party is to

26 | be believed, and all reasonable inferences that may be drawn from the facts placed

27 | before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at

28 | 255.

1   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

2   obligation to produce a factual predicate from which the inference may be drawn.

3   Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,

4   810 F.2d 898 (9th Cir. 198

5

6   **ANALYSIS**

7

8   **A.  Hostile Work Environment**

9   Plaintiff, in asserting a Title VII claim under a hostile work environment theory,

10   must first establish the existence of a hostile work environment to which she was

11   subjected.  Second, if she establishes that such an environment was indeed present,

12   she must show that her employer, here CDCR, was liable for permitting the harassment

13   that caused the hostile environment to exist. Freitag v. Ayers, 468 F.3d 528, 539 (9th

14   Cir. 2006) (citing Little v. Windermere Relocation, Inc., 301 F.3d 958, 968 (9th Cir.

15   2002)).

16   Turning initially to the first requirement, in order to show a hostile work

17   environment, Plaintiff Daniels "must prove that (1) she was subjected to verbal or

18   physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) this

19   conduct was sufficiently severe or pervasive to alter the conditions of employment and

20   create an abusive working environment." Id.  With respect to the "severe or pervasive"

21   component of the requisite showing, the standard is severe or pervasive, not both.  See

22   Hostetler v. Quality Dining, Inc., 218 F.3d 798, 808 (7th Cir. 2000) ("Harassment need

23   not be severe *and* pervasive to impose liability; one or the other will do.").  Courts have

24   found no "threshold 'magic number' of harassing incidents that can give rise . . . to

25   liability" under a hostile work environment theory; nor have they specified "a number of

26   incidents below which a plaintiff fails as a matter of law to state a claim." Dee v. Vintage

27   Petroleum, Inc., 106 Cal. App. 4th 30, 36 (2003); (quoting Rodgers v. Western-Southern

28   Life Ins. Co., 12 F.3d 668, 674 (7th Cir. 1993)).  The Ninth Circuit has recognized that a

1  single incident of severe abuse can constitute a hostile work environment.  See Freitag,

2  468 F.3d at 540.

3       In the present matter, there can be no doubt that, to the extent sexually oriented

4  images were openly displayed, that conduct was both sexual in nature and unwelcome

5  as far as Plaintiff was concerned.  The salient issue, however, is whether that conduct

6  was sufficiently "severe or pervasive" to create an abusive working environment for

7  Ms. Daniels.  In making that determination, the Ninth Circuit indicates that the totality of

8  the circumstances must be considered, including whether the harassment was both

9  objectively and subjectively abusive.  Id.   Other courts have unquestionably recognized

10  that the proliferation of pornographic material can itself create an environment

11  demeaning and oppressive to women in the sense they may be reduced in such

12  environment to mere "sexual playthings."  See Barbetta v. Chemlawn Serv. Corp., 669 F.

13  Supp. 569, 573 (W.D.N.Y. 1987).

14       Only if Plaintiff succeeds in demonstrating the existence of a hostile work

15  environment is it necessary for the Court to address liability concerns.  Significantly,

16  however, liability for inmate sexual harassment depends not on the prisoners' conduct

17  but instead on the correctional facility's response to inmate behavior.  CDCR is not liable

18  if it has taken corrective measures "reasonably calculated to end the harassment," with

19  the issue of reasonableness hinging on the promptness of the prison's response and its

20  ability to stop the harassment.  Id. at 539-540 (citing Ellison v. Brady, 924 F.2d 872, 882

21  (9th Cir. 1991)).

22       In addressing the severe and pervasive issue in this particular case, the Court

23  must also look to the prison setting itself.  As the court in Slayton v. Ohio Dept. of Youth

24  Servs., 206 F.3d 669 (6th Cir. 2000), stated:

25       "Prisoners, by definition, have breached prevailing societal
       norms in fundamentally corrosive ways.  By choosing to work
26       in a prison, corrections personnel have acknowledged and
       accepted the probability that they will face inappropriate and
27       socially deviant behavior."

28  Id. at 669.

10

1    Slayton nonetheless recognizes that this general rule against liability for inmate

2    conduct "does not apply when the institution fails to take appropriate steps to remedy or

3    prevent illegal inmate behavior."  Id.  While this makes the focus for purposes of

4    assessing responsibility not on the inmates but instead on the correctional institution's

5    own response to unacceptable conduct, the fact remains that whether or not a sexually

6    charged atmosphere created by inmate behavior is sufficiently severe and pervasive

7    must necessarily be viewed in the context of a prison environment itself.  It would appear

8    axiomatic that what amounts to severe and pervasive misconduct in a correctional

9    setting is wholly different than what would be reasonably expected within the confines of,

10   for example, a law office.  See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75,

11   81 (1998) (in order to assess whether hostile work environments exists, court must

12   devote "careful consideration of the social context in which particular behavior occurs

13   and is experienced by its target . . . ").

14       In the instant matter, the Court recognizes Plaintiff was working in an all-male

15   prison where some exposure on her part to sexually oriented images had to have been

16   expected.  The Court further recognizes that Plaintiff's exposure to the objectionable

17   materials occurred over a fairly brief period extending only a couple of months in 2007.

18   The key factor in determining whether the conduct was sufficiently severe to satisfy the

19   hostile work environment lies in an examination of the nature of the activity which

20   affected Plaintiff.

21       Here, according to Ms. Daniels, her supervisors approved, and even furnished,

22   materials which had previously been found to be sexually explicit and therefore banned

23   as impermissible contraband.  In addition, her supervisors exacerbated the situation by

24   telling inmates that Plaintiff was the only correctional officer who had any problem with

25   the materials.  According to Plaintiff, that undermined her ability to control wayward

26   inmates.  It is axiomatic that the effectiveness of a correctional officer hinges on his or

27   her ability to both effectively monitor and correct inmate behavior.

28   ///

11

1    Not surprisingly, Plaintiff asserts her supervisors' dismissal of any concern on her part

2    about sexual images adversely affected her own supervisory ability over the inmates.

3    Even more importantly, she alleges that such dismissal of her authority placed Plaintiff in

4    actual danger by putting her at risk of being assaulted by angry wards.  Indeed, as

5    indicated above, in complaining to Superintendent Umeda about the situation, she

6    expressed fear about an assault, and recounted examples of inmates becoming agitated

7    when sexual materials were taken from them.

8         The Slayton court recognizes that a hostile work environment can be created

9    where a supervisor has "encouraged, endorsed, and even instigated the inmates'

10   harassing conduct."  Slayton, 206 F.3d at 678.  In this Court's view, the combination of

11   the sexual images, the fact that at least some of the concerned magazines had already

12   been expressly banned, and the fact that Plaintiffs' two supervisors may have approved

13   and even furnished the materials in question is enough for Plaintiff to survive summary

14   judgment as to the existence of a hostile work environment.   Ultimately, a jury must

15   determine whether these combination of factors subjected Plaintiff to a hostile work

16   environment.  The Court cannot make that determination as a matter of law, as it must to

17   grant summary judgment in CDCR's favor at this juncture.

18        Defendant fares no better in the related inquiry as to whether the CDCR took

19   prompt and appropriate corrective action to end the harassment.  As indicated above,

20   the CDCR is liable for harassing conduct by inmates where it "either ratifies or

21   acquiesces in the harassment by not taking immediate and/or corrective action when it

22   knew of should have known of the conduct."  Freitag, 468 F.3d at 538 (citing Folkerson

23   v. Circus Circus Enters., Inc.,107 F.3d 754, 756 (9th Cir. 1997)).  Liability is therefore

24   "grounded not on the harassing act itself-- i.e., inmate misconduct-- but rather on

25   [CDCR's]  'negligence and ratification' of the harassment through its failure to take

26   appropriate and reasonable responsive action."  Freitag, 468 F.3d at 538 (citing

27   Galdamez v. Potter, 415 F.3d 1015, 1022 (9th Cir. 2005)).

28        Plaintiff alleges here that her supervisors actually exacerbated the situation by

1   telling inmates that Plaintiff was the only one with a problem about sexual imagery, and

2   by approving and/or providing the magazines themselves.  Since the court must deem

3   Plaintiff's allegations in this regard as true, at least for purposes of summary judgment,

4   such conduct cannot be considered as an appropriate and reasonable effort on CDCR's

5   part to end the harassment.  Defendant's request for summary adjudication as to

6   Plaintiff's hostile work environment claim therefore fails on that ground as well.

7

8       **B.  Retaliation**

9       To establish a prima facie case of retaliation, Plaintiff must show 1) that she

10  engaged in a protected activity; 2) that CDCR subjected her to an "adverse employment

11  action"; and 3) that there is a causal link between the protected activity and the adverse

12  action.  Bleeker v. Vilsack, 468 Fed. App'x 732, 732 (9th Cir. 2012); Ray v. Henderson,

13  217 F.3d 1234, 1240) (9th Cir. 2000).  "[A]n adverse employment action is one that

14  materially affects the compensation, terms, conditions or privileges of employment.

15  Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2008).  The Ninth Circuit has

16  recognized that "a wide array of disadvantageous changes in the workplace [may]

17  constitute adverse employment actions."  Ray, 217 F.3d at 1240.

18      Plaintiff here has identified several forms of potential retaliation.  First, she alleges

19  that her supervisor, Mark Miranda, wrote unwarranted disciplinary reports and placed

20  them in her file in response to her efforts to eradicate inmate access to sexually

21  inappropriate materials.  That discipline was meted out in close proximity to Plaintiff's

22  complaints to CHAD's Superintendent, Eric Umeda, about the proliferation of those

23  materials.  Even though the reports in question were ultimately removed from Plaintiff's

24  personnel file within about three months, they may still qualify as an adverse

25  employment action under the circumstances present here.  It is up to the jury to

26  determine what weight to give Miranda's disciplinary reports given the fact that they were

27  deleted in relatively short order.

28  ///

13

1     Second, and more importantly in the Court's estimation is Plaintiff's allegation that

2 her supervisors told inmates, after Plaintiff had taken away magazines that she deemed

3 to be inappropriate, that Plaintiff was the only correctional officer with a problem

4 concerning graphic sexual magazines.  To the extent that this undermined Plaintiff's

5 authority, and even subjected her to the risk of assault, as Plaintiff alleges, such factors

6 may also constitute actionable retaliation.  Third, to the extent that Miranda is alleged to

7 have repeatedly referred to Plaintiff as a "fat girl" in front of inmates, humiliating her on

8 the basis of her size may evince further retaliation as Plaintiff alleges.  For any number

9 of reasons, then, summary adjudication as to Plaintiff's retaliation claim also fails.

10

11                              **CONCLUSION**

12

13     Given the foregoing, the Court finds that CDCR has not demonstrated its

14 entitlement to summary adjudication as to either of Plaintiff Yvette Daniels' claims.

15 Defendant's Motion for Summary Judgment (ECF No. 67) is therefore DENIED.[4]

16     IT IS SO ORDERED.

17 Dated:  December 26, 2013

18

19

20 _____
   MORRISON C. ENGLAND, JR, CHIEF JUDGE
21 UNITED STATES DISTRICT COURT

22

23

24

25

26

27 _____

28 [4] Having determined that oral argument was not of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Cal. Local Rule 230(g).