UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YVETTE DANIELS, et al., | No.  2:10-cv-00003 MCE-AC |
| Plaintiffs, | |
| v. | FINAL PRETRIAL ORDER |
| CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, | TRIAL DATE: March 3, 2014 TIME: 9:00 a.m. |
| Defendant. | |

Pursuant to Court Order, a Final Pretrial Conference was held on January 23, 2014.  Pamela Price appeared as counsel for Plaintiffs.  Kristin Daily and Amy Lindsey-Doyle appeared as counsel for Defendant.  After hearing, the Court makes the following findings and orders:

I.      JURISDICTION/VENUE

Jurisdiction is predicated upon 29 U.S.C. section 1331.  Jurisdiction and venue are not contested.

II.     JURY

Both parties timely demanded a jury trial pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

///

1

1    III.    UNDISPUTED FACTUAL ISSUES

2          **A.    Core Undisputed Facts Relevant to all Claims**

3          1.    Plaintiff Yvette Daniels has been employed as a Youth Correctional

4    Counselor by the California Department of Corrections and Rehabilitations since 1994.

5          2.    In 2007, title 15 of the California Code of Regulations section 4710,

6    subsection (g) required superintendents of juvenile detention facilities to define

7    "contraband" for his or her facility.  The subsection required the definition to prohibit

8    material that fell into one of five groups of sexually-related material.

9          3.    Subsection (h) of section 4710 required the superintendent to restrict or

10   regulate the display of "sex-oriented pictures" outside of a wards' locker or individual

11   room.

12         4.    Effective 2011, subsections g and h of section 4710 were amended to,

13   among other things, remove the phrase "ward" in favor of "youths." The subsections

14   were then renumbered f and g, respectively.

15         5.    CHAD utilized the Disciplinary Decision Making System (DDMS) outline in

16   section 4630 through 4635 of the title 15 of the California Code of Regulations.

17         6.    Ward misconduct did not always trigger the DDMS.  In lieu of triggering the

18   DDMS, staff engaged in a variety of disciplinary actions including: verbal counseling,

19   direct instruction, or refraining from discipline.

20         **B.    Undisputed Facts Relevant to Hostile Work Environment and**

21              **Retaliation Claims**

22         2.    A superintendent of a juvenile detention facility is the counterpart for a

23   warden of an adult facility.

24         3.    On August 9, 2007, Superintendent Umeda issued an e-mail to staff

25   reminding them of the policies regarding inappropriate material and that all supervisors

26   are tasked with ensuring the workplace is free from harassment.

27   ///

28   ///

                                        2

4.      A WID is documentation of a discussion between a supervisor and an employee to address substandard performance on the job.  Personal signature and date memorialize the date of the discussion and its subject.

IV.     DISPUTED FACTUAL ISSUES

The remaining claims for trial are:

**A.      Plaintiff's Disputed Facts as to all claims:**

1.      Officer Daniels is an African-American Woman.

2.      Between 2007 and 2013 Officer Daniels bid for positions in halls other than San Joaquin.  During some of this time, San Joaquin Hall was closed.  Between 2007 and 2013, Officer Daniels' job classification did not change.

3.      Starting in 2003, Officer Daniels has served as a Youth Correctional Counselor at the juvenile facility N.A. Chaderjian Youth Correctional Facility (CHAD).

4.      In 2007, Officer Daniels was assigned to San Joaquin Hall on the 6:00 a.m. to 2:00 p.m. shift.

5.      Sexually explicit magazines and photographs became a widespread problem in San Joaquin Hall upon the arrival of Mark Miranda as Senior Youth Correctional Counselor for the unit.

6.      In a memorandum dated March 10, 2005, the CHAD superintendent instructs that magazines such as, "Maxim" and "Blackmen" contain sexually explicit material and cannot be received by wards.

7.      Officer Daniels was the only female staff assigned to San Joaquin Hall.

8.      Officer Daniels consistently received standard or above-standard performance reviews.

9.      Officer Daniels is not aware of any written policy stating wards are allowed "sexually oriented materials," but may not view them in the open.

10.     On or about June 20, 2007, Officer Daniels alleges that Miranda permitted X-Box video games depicting sexual content, violence, and mature content onto San Joaquin hall to be distributed and played by wards.

3

1       11.     Around the same time, Officer Daniels learned that Miranda brought

2 movies to San Joaquin Hall which she felt depicted offensive content.  One film was

3 American History, X, which depicts a rape of an inmate.  A second film, 300, depicts

4 rape, female nudity, and orgies.

5       12.     On August 4, 2007, Officer Daniels confiscated a Spanish Maxim from a

6 ward.

7       13.     On August 7, 2007, Officer Daniels met with CHAD Superintendent Eric

8 Umeda to complain that Miranda subjected her to a hostile work environment through his

9 conduct on the hall.

10       14.     Officer Daniels did not use the term "sexually oriented material" in her role

11 as a Youth Correctional Counselor

12       15.     CHAD did not have a set policy instructing Youth Correctional Counselors

13 or other employees when to confiscate sexually explicit material.

14       16.     CHAD did not have any instruction on when to confiscate "sexually

15 oriented material."

16       17.     Discipline of a ward for inappropriate conduct is often discretionary and

17 changes dependant on the Youth Correctional Counselor giving discipline.

18       18.     Officer Daniels is not aware of any actions taken by her supervisors to

19 clarify terms such as "sexually explicit material."

20       19.     Sexually explicit material was a pervasive problem in San Joaquin Hall for

21 several months in 2007.

22       20.     One magazine Officer Daniels confiscated contained a marking made by a

23 coworker, Youth Correctional Counselor McGhee.

24       21.     YCC McGhee previously confiscated the magazine with the marking from a

25 ward.

26       22.     After marking one of its pages, YCC McGhee gave the magazine to SYCC

27 Miranda.

28 ///

23.     When Officer Daniels confiscated the marked magazine, the ward who had it became very hostile with her.

24.     Wards in San Joaquin Hall did not respect her authority when Officer Daniels confiscated sexually explicit magazines.

25.     Multiple wards confronted Officer Daniels and questioned her authority when she confiscated their sexually explicit magazines.

26.     The "Youth Sexual Misconduct Policy" and associated training module was not created until 2008.

27.     In 2007, there was no policy or training module in effect at CHAD similar to the "Youth Sexual Misconduct Policy."

**B.      Plaintiff's Disputed Facts as to Hostile Work Environment**

1.      In June 2007, Mark Miranda began working in San Joaquin Hall as the Senior Youth Correctional Counselor and became Officer Daniels' direct supervisor. This is the first time the two worked together.

2.      In July and August 2007, Officer Daniels confiscated magazines from wards, including a "Smooth," a "Maxim," a "King,"  and "Black Men," which she believed to be sexually explicit and/or sexually oriented and were in violation of the Department's regulations and policies.

3.      Officer Daniels confiscated and documented the ward's possession of these items on Behavior reports.

4.      Several wards who possessed sexually explicit magazines claimed that SYCC Miranda approved or gave them the magazine.

5.      Officer Daniels confiscated and documented ward possession of sexually explicit material on "Behavior Reports."

6.      Officer Daniels did not hear the result of any or most of the "Behavior Reports" documenting her confiscations of sexually explicit magazines.

7.      The Behavior Reports documenting Officer Daniels' confiscations of sexually explicit magazines are still stored in the Defendant's database.

5

8.      Some of the Behavior Reports documenting Officer Daniels' confiscations of sexually explicit magazines were dismissed by either SYCC Miranda or TTS Alvarado.

9.      One or two days after Officer Daniels met with Superintendent Umeda, the complained-of video games and movies had not been removed from San Joaquin Hall.

10.     Officer Daniels collected the complained-of video games herself and removed them.

11.     Officer Daniels completed the removal of the complained-of video games within a week of her August 7, 2007 meeting with Superintendent Umeda.

12.     On August 18, 2007, Officer Daniels received an e-mail from Youth Correctional Counselor Lewellen, forwarding a message he had sent to Miranda.  The correspondence indicated Lewellen's disapproval of a magazine he confiscated.

13.     Officer Daniels made significant efforts to cure the hostile work environment by dealing with immediate her supervisors, SYCC Miranda and TTS Alvarado.

14.     When Officer Daniels went to complain to the supervisor above SYCC Miranda, TTS Alvarado, he told Officer Daniels he did not have much time and she would have to be quick.

15.     Before allowing Officer Daniels to speak during their meeting, TTS Alvarado stated, "I fully support the SYCC and his decisions."

16.     SYCC Miranda was not immediately removed from San Joaquin Hall.

17.     SYCC Miranda continued to be the Senior Youth Correctional Counselor on San Joaquin Hall for several days.

18.     Officer Daniels confiscated multiple items and counseled even more wards who possessed offending items.

19.     Either SYCC Miranda or TTS Alvarado dismissed some of the Behavior Reports Officer Daniels created.

///

///

6

**C.      Plaintiff's Disputed Facts as to Retaliation**

1.      On August 12, 2007, Officer Daniels confiscated a "Blackmen" magazine from Ward Libbey.

2.      Ward Libbey demanded the  magazine back.  He became aggressive and hostile with Officer Daniels.

3.      Ward Libbey, was extremely hostile for several days, beyond the typical level in the juvenile detention setting.

4.      Sometime after August 15, 2007, Ward Libbey confronted Officer Daniels about her confiscation of the magazine.

5.      TTS Alvarado told Ward Libbey that Officer Daniels was the only CDCR employee who had a "problem" with wards possessing magazines like "Blackmen."

6.      TTS Alvarado made Officer Daniels a target for wards as a means of retaliating against her.

7.      Officer Daniels called Superintendent Umeda and Assistant Superintendent Joan Loucraft to aid her in dealing with Ward Libbey.

8.      Neither Superintendent Umeda nor Assistant Superintendent Loucraft responded to Offier Daniels' call for aid in dealing with Ward Libbey.

9.      Officer Daniels requested that Lieutenant Ross Moore be present while Officer Daniels counseled ward Libbey about her confiscation of the "Blackmen" magazine.

10.      Ward Libbey was confrontational with Officer Daniels during her counseling session with him.

11.      Defendant CDCR took no action to assist Officer Daniels beyond Officer Daniels' own self-help remedies.

12.      When Lt. Moore and Officer Daniels counseled Ward Libbey, Ward Libbey claimed that TTS Alavarado and SYCC Miranda told him he could have the magazine Officer Daniels confiscated so long as he kept it in his room.

///

13.   Ward Libbey claimed that Alvarado and Miranda approved of his magazine and that Officer Daniels should not be able to take it.

14.   In August 2007, SYCC Miranda  repeatedly stated to a ward, "Mother F*****, you were messing with a fat girl."

15.   After SYCC Miranda's comments, "Mother F*****, you were messing with a fat girl," the ward responded, "I wasn't ****ing with a fat girl."

16.   Miranda and the ward repeated the exchange above at least once.

17.   These comments were directed towards Officer Daniels and her body, either directly or indirectly because of her gender and her opposition to the wards' possession of sexually explicit materials.

18.   SYCC Miranda placed a Work Improvement Discussion form, dated July 31, 2007 in Officer Daniels' personnel file.

19.   SYCC Miranda placed a Work Improvement Discussion form, dated August 1, 2007 in Officer Daniels' personnel file.

20.   SYCC Miranda placed a Work Improvement Discussion form, dated August 6, 2007 in Officer Daniels' personnel file.

21.   Officer Daniels was not asked to participate in an administrative inquiry process relating to a Work Improvement Discussion form.

22.   Officer Daniels and SYCC Miranda did not review a Work Improvement Discussion form on July 31, 2007.

23.   Officer Daniels and SYCC Miranda did not review a Work Improvement Discussion form on August 1, 2007.

24.   On the morning of August 7, 2007 SYCC Miranda presented Officer Daniels with a Work Improvement Discussion form dated August 6, 2007.

25.   Ward complaints against Youth Correctional Counselors are a means of ward retaliation.

26.   Officer Daniels was never disciplined for performance issues prior to her confiscations of sexually inappropriate material from wards.

1    27.    Officer Daniels was never disciplined for misconduct prior to her

2  confiscations of sexually inappropriate material from wards.

3    28.    On August 15, 2007, Officer Daniels filed a written complaint against

4  Miranda for sexual harassment, unprofessional behavior, intimidation, and hostile work

5  environment.

6    29.    On August 15, 2007, Officer Daniels filed a complaint against TTS

7  Alvarado.

8    30.    On October 10, 2007, Officer Daniels submitted another complaint against

9  TTS Alvarado and requested TTS Alvarado be removed San Joaquin Hall.  CDCR did

10  not move Alvarado.

11    **D.    Defendant's Disputed Facts:**

12    1.    In June 2007, Mark Miranda began working in San Joaquin Hall as the

13  Senior Youth Correctional Counselor and became Ms. Daniels' direct supervisor.  This is

14  the first time the two worked together.

15    2.    In July and August 2007, Ms. Daniels confiscated magazines from wards

16  including a "Maxim" and "Black Men," which she believed to be sexually explicit and/or

17  sexually oriented and were in violation of the Department's regulations and policies.

18    3.    Ms. Daniels confiscated and documented the ward's possession of these

19  items on Behavior reports.

20    4.    Either SYCC Miranda or TTS Alvarado dismissed some of the Behavior

21  Reports Ms. Daniels created.

22    5.    On or about June 20, 2007, Ms. Daniels alleges that Miranda permitted X-

23  Box video games depicting sexual content, violence, and mature content onto San

24  Joaquin hall to be distributed and played by wards.

25    6.    Around the same time, Ms. Daniels learned that Miranda brought movies to

26  San Joaquin Hall which she felt depicted offensive content.  One file was American

27  History, X, which depicts a rape of an inmate.  A second film, 300, depicts rape, female

28  nudity, and orgies.

7.      On August 4, 2007, Ms. Daniels confiscated a Spanish Maxim from a ward.

8.      On August 7, 2007, Ms. Daniels met with CHAD Superintendent Eric Umeda to complain that Miranda subjected her to a hostile work environment through his conduct on the hall.

9.      A superintendent of a juvenile detention facility is the counterpart for a warden of an adult facility.

10.     On August 9, 2007, Superintendent Umeda issued an e-mail to staff reminding them of the policies regarding inappropriate material and that all supervisors are tasked with ensuring the workplace is free from harassment.

11.     On August 10, 2007, Superintendent Umeda called Ms. Daniels at her home to tell her Miranda would be removed from San Joaquin Hall.

12.     On August 18, 2007, Ms. Daniels received an e-mail from Youth Correctional Counselor Lewellen, forwarding a message he had sent to Miranda.  The correspondence indicated Lewellen's disapproval of a magazine he confiscated.

13.     On August 12, 2007, Ms. Daniels confiscated a "Blackmen" magazine from Ward Libbey.

14.     Ward Libbey demanded the  magazine back.  He became aggressive and hostile with Ms. Daniels.

15.     Sometime after August 15, 2007, Ward Libbey confronted Ms. Daniels about her confiscation of the magazine.

16.     Ms. Daniels requested that Lieutenant Ross Moore be present while Ms. Daniels counseled ward Libbey about her confiscation of the "Blackmen" magazine.

17.     Ward Libbey was confrontational with Ms. Daniels during her counseling session with him.

18.     On July 31, 2007, Miranda met with Ms. Daniels.

19.     A WID is documentation of a discussion between a supervisor and an employee to address substandard performance on the job.  Personal signature and date memorialize the date of the discussion and its subject.

10

20.    On August 15, 2007, Ms. Daniels filed a written complaint against Miranda for sexual harassment, unprofessional behavior, intimidation, and hostile work environment.

21.    On August 15, 2007, Ms. Daniels filed a complaint against TTS Alvarado.

22.    On October 10, 2007, Ms. Daniels submitted another complaint against TTS Alvarado and requested TTS Alvarado be removed San Joaquin Hall.  CDCR did not move Alvarado.

23.    Ms. Daniels' worked the 6 a.m. to 2 p.m. shift, a position she obtained through the competitive post and bid process.

24.    The Department closed San Joaquin Hall and other halls at CHAD for various periods of time due to budgetary, security, and other business related reasons. As a result, between 2007 and 2012, Ms. Daniels and many other youth counselors were reassigned to other halls in the facility.

25.    Throughout her employment with the Department, Ms. Daniels has remained in the same job classification and has worked the same shift.

26.    Sexually oriented material differs from sexually explicit material, as it can be possessed, but not openly displayed by wards.  Correctional officers have the authority to confiscate any sexually oriented material that are openly displayed by wards and subject the wards to discipline.

27.    Where appropriate, staff may verbally counsel or directly instruct the ward to comply with the Department's policies.  Alternatively, the discipline imposed on the ward can include loss of privileges, denial of parole, or referral to the District Attorney for further prosecution.

28.    Ms. Daniels understood that there is no set procedure staff had to follow in terms of enforcing the policies prohibiting the display of sexually explicit material.

29.    Ms. Daniels also understood that she had the authority to remove any material she thought was inappropriate.

///

30.     The Department provides training on its regulations and policies to all of its employees.

31.     As a Senior Youth Counselor, Mr. Miranda was Ms. Daniels's direct supervisor, from June 19, 2007 to August 2007.

32.     After August 2007, Mr. Miranda was never her immediate supervisor.

33.     Other than on rare and limited occasions, Ms. Daniels was entirely outside Miranda's chain of command from August 2007 to the present.

34.     On May 31, 2007, prior to Miranda's arrival on San Joaquin Hall, a ward filed a complaint against Ms. Daniels alleging she acted inappropriately with wards and that he felt sexually harassed.

35.     On June 4, 2007, a second ward filed a complaint against Ms. Daniels alleging inappropriate and unprofessional conduct.

36.     An administrative inquiry into ward grievances against Ms. Daniels occurred after the grievances were filed on May 31, 2007 and June 4, 2007.

37.     Mark Miranda had no involvement in the administrative inquiry into the ward grievances against Ms. Daniels.

38.     On July 31, 2007, Mr. Miranda, as Ms. Daniels' supervisor, had a meeting with her to discuss a Work Improvement Discussion Memo (WID) and discuss the complaints wards  made against her. This was two months after the wards made their complaints.  Mr. Miranda discussed the administrative inquiry  which followed the wards' complaints and the findings that she had engaged in unprofessional conduct with wards. As a result of the findings, the Department issued a work improvement discussion memo to Ms. Daniels on August 1, 2007, which was placed in her personnel file.  Ms. Daniels refused to sign the memorandum.

39.     Ms. Daniels did not allege she was subjected to a hostile or retaliatory work environment prior to June 2007.

///

///

12

1    40.    On August 4, 2007, Ms. Daniels confiscated a Spanish Maxim magazine, a

2  sexually oriented material, as it was left out in the room of ward Phar.  Ward Phar did not

3  harass, ridicule or intimidate Ms. Daniels in response to her confiscation of the

4  magazine.

5    41.    Ms. Daniels alleges that on or about June 20, 2007 Mr. Miranda allowed

6  one video game onto San Joaquin Hall which Ms. Daniels believed depicted sexual

7  content and six others that were inappropriate due to their violent content and mature

8  ratings.  Ms. Daniels did not complaint about the alleged video games until August 7,

9  2007.

10   42.    On August 7, 2007, over 45 days after the delivery of video games on the

11  hall, Ms. Daniels complained to CHAD Superintendent Eric Umeda, the head of the

12  institution, about the games on the hall and her August 4, 2007 confiscation of a

13  magazine from ward Phar.  The complaint alleged that Mr. Miranda caused a hostile

14  work environment by his allowance of these materials on the hall.

15   43.    The same day Ms. Daniels complained, Superintendent Umeda had a

16  meeting with Ms. Daniels, to discuss her concerns regarding the video games,

17  magazines, and other issues Ms. Daniels had.  Ms. Daniels testified she believed

18  Superintendent Umeda took her concerns seriously.

19   44.    Two days later, on August 9, 2007, Superintendent Umeda issued a

20  memorandum addressing inappropriate video games and seeking a list of all games and

21  their appropriateness on all halls for his review.  Within a week of Ms. Daniels's meeting

22  with Superintendent Umeda, all the video games that Ms. Daniels felt were inappropriate

23  were removed from the hall.

24   45.    On August 12, 2007, Ms. Daniels confiscated a magazine entitled

25  "Blackmen" from a ward who was intellectually disabled, identified as "Ward P.L.," due to

26  its sexually explicit content.  After Ms. Daniels confiscated the "Blackmen" magazine,

27  Ward P.L. demanded the magazine back from Ms. Daniels and became hostile towards

28  ///

13

1   her.  Ward P.L. is the only ward who became hostile towards Ms. Daniels in response to

2   her confiscation of sexual materials.

3        46.    Facility management took action to cease Ward P.L.'s harassment of Ms.

4   Daniels regarding the return of the magazine.  First, Correctional Lieutenant instructed

5   Ward P.L. that if he continued harassing Ms. Daniels he would be removed from the hall.

6   Second, on August 17, 2007, Superintendent Umeda instructed Ward P.L.  to cease

7   bothering Ms. Daniels about the confiscation of his magazine.  Additionally,

8   Superintendent Umeda agreed with Ms. Daniels that the "Blackmen" magazine was

9   contraband and refused to return the magazine to Ward P.L.

10        47.    Ms. Daniels filed additional complaints on: August 14, 2007, August 15,

11   2007, August 16, 2007, and August 17, 2007.  These complaints addressed the two

12   incidents where Ms. Daniels confiscated sexual materials from Wards Phar and P.L. a

13   few days earlier.  Ms. Daniels filed each of these complaints with Superintendent

14   Umeda.

15        48.    In late August 2007, Mr. Miranda was moved from San Joaquin Hall and

16   was no longer Ms. Daniels's direct supervisor.  After Mr. Miranda left San Joaquin Hall in

17   August 2007, Ms. Daniels testified that she had no further problems enforcing the

18   regulations and policies prohibiting ward possession and display of sexual materials.

19        49.    Ms. Daniels testified that she received support of her enforcement of the

20   regulations and policies regarding possession and display of sexual materials from all

21   management except Mr. Miranda and Mr. Alvarado, her second line supervisor.  While

22   working on other halls, Ms. Daniels felt management supported her enforcement of the

23   sexual materials regulations and policies.  She felt her co-workers supported the

24   enforcement of the regulations and policies regarding possession and display of sexual

25   materials, as they too felt such materials were inappropriate.

26        50.    On or about September 21, 2007, Ms. Daniels had a meeting with

27   Superintendent Umeda to discuss her personnel file and documents she contended

28   were false and wrongfully placed in her file by Mr. Miranda.  Specifically, Ms. Daniels

1   claimed certain documents should be removed from her file including: the August 1,

2   2007, Work Improvement Discussion Memo; and a June 24, 2007 note authored by

3   Mr. Miranda stating that Ms. Daniels did not report Level 3 misconduct of a ward.

4   According to Ms. Daniels, these documents were based upon false information and only

5   placed in her file in retaliation for her complaints against Mr. Miranda.  In response to

6   Ms. Daniels' complaint, the Department removed these documents from her personnel

7   file.

8           51.     On September 28, 2007, Superintendent Umeda issued a memo to

9   Ms. Daniels confirming the removal of the documents from Ms. Daniels' personnel file.

10          52.     In October 2007, Ms. Daniels provided a written complaint to

11  Superintendent Umeda claiming Mr. Alvarado was being rude to her and that he deleted

12  her August 9, 2007 behavior reports concerning her confiscation of sexual materials

13  from wards. Ms. Daniels requested that Mr. Alvarado be removed from San Joaquin Hall.

14  On October 22, 2007, Ms. Daniels met with Superintendent Umeda and Assistant

15  Superintendent Joan Loucraft, to discuss her complaints.

16          53.     On October 31, 2007, Mr. Umeda issued a memo to Ms. Daniels, advising

17  her that it was standard operating procedure for Mr. Alvarado to dismiss the August 9,

18  2007 behavior reports under the circumstances, and that Mr. Alvarado would not be

19  moved from the hall.  The memo further advised that Ms. Daniels's complaint would be

20  forwarded to the Department's Office of Civil Rights.

21          54.     For nearly four years, from October 31, 2007 to January 2011, Ms. Daniels

22  did not have any complaints regarding her exposure to sexual materials in the workplace

23  or retaliation.

24          55.     Ms. Daniels was off work from May 2010 until January 18, 2011.  At the

25  time Ms. Daniels went on leave in May 2010, and until her assignment to San Joaquin

26  Hall in July 2012, she was not assigned to any specific hall.  Due to hall closures, she,

27  along with other staff floated to various halls as needed.

28  ///

56.     In late January 2011, Ms. Daniels was advised that due to staffing shortages, she would be reassigned to Tuolumne Hall effective February 1, 2011.  Ms. Daniels admits Tuolumne Hall is not a less desirable position than her prior assignment. Shortly thereafter, in on or about January 25, 2011, Ms. Daniels went off work again and did not return to work until May of 2011.

57.     Ms. Daniels reported to Senior Youth Counselor Jeanne Espinoza and Team Treatment Supervisor Juan Guajardo when she returned from leave in May 2011.

58.     On or about October 27, 2011, Ms. Daniels was presented with a performance evaluation by her direct supervisor Jeanne Espinoza. The evaluation was for the time period of March 2010 through March 2011.  Ms. Daniels was off work for the majority of that year.  The performance evaluation provided a standard review for the year and recognized Ms. Daniels was on leave and unable to be supervised.  The evaluation did not contain any substandard marks or negative comments of Ms. Daniels's work performance.

59.     Ms. Daniels filed a grievance in December 2011, with the Department's Office of Labor Relations regarding the evaluation, alleging it was presented to her outside of the time frames outlined in the union agreement.  Ms. Daniels was provided a new performance evaluation in March 2012, which rated her performance with both standard and above standard marks.  Ultimately, the Office of Labor Relations agreed that Ms. Daniels' March 2011 evaluation was presented outside the permissible time limits.  However, because Ms. Daniels received another timely evaluation in March 2012, the Office of Labor Relations did not address the matter any further.

60.     After the 2011 performance evaluation, Ms. Daniels had no further complaints against Mr. Miranda.

61.     Ms. Daniels exposure to sexual materials in the workplace is not severe and pervasive that it alters the terms and condition of her employment with the Department.

///

16

62.     The Department had policies and procedures addressing sexual materials (explicit or otherwise).

63.     The Department supported Ms. Daniels's complaints regarding sexual materials in San Joaquin Hall in the summer of 2007.

64.     The Department utilized preventative and remedial measure to address female officer/counselor exposure to sexual materials possessed by wards.

65.     Ms. Daniels was not subjected to an adverse employment action by the Department in response to her complaints to management.

All issues of fact remaining in dispute are subject to proof at the time of trial.

V.     WITNESSES

Plaintiffs anticipate calling the witnesses listed on Attachment "A".

Defendant anticipates calling the witnesses listed on Attachment "B".

Each party may call a witness designated by the other.

A.     No other witnesses will be permitted to testify unless:

(1)     The party offering the witness demonstrates that the witness is for the purpose of rebutting evidence which could not be reasonably anticipated at the Final Pretrial Conference, or

(2)     The witness was discovered after the Final Pretrial Conference and the proffering party makes the showing required in "B" below.

B.     Upon the post-pretrial discovery of witnesses, the attorney shall promptly inform the Court and opposing parties of the existence of the unlisted witnesses so that the Court may consider at trial whether the witnesses shall be permitted to testify.  The evidence will not be permitted unless:

(1)     The witnesses could not reasonably have been discovered prior to pretrial;

(2)     The Court and opposing counsel were promptly notified upon discovery of the witnesses;

(3)     If time permitted, counsel proffered the witnesses for deposition;

17

1    (4)    If time did not permit, a reasonable summary of the witnesses'

2 testimony was provided by opposing counsel.

3 VI.    <u>EXHIBITS - SCHEDULES AND SUMMARIES</u>

4    At present, Plaintiffs contemplate by way of exhibits those listed on Attachment

5 "C".

6    At present, Defendant contemplates by way of exhibits those listed on Attachment

7 "D".

8    **Plaintiffs' exhibits shall be listed numerically.   Defendant's exhibits shall be**

9 **listed alphabetically.**  The parties shall use the standard exhibit stickers provided by

10 the Court Clerk's Office:  pink for Plaintiffs and blue for Defendant.  After three letters,

11 note the number of letters in parenthesis (i.e., "AAAA(4)" to reduce confusion during the

12 trial.  All multi-page exhibits shall be stapled or otherwise fastened together and each

13 page within the exhibit shall be numbered.  All photographs shall be marked individually.

14 The list of exhibits shall not include excerpts of depositions which may be used to

15 impeach witnesses.

16    Each party may use an exhibit designated by the other.  In the event that Plaintiffs

17 and Defendant offer the same exhibit during trial, that exhibit shall be referred to by the

18 designation the exhibit is <u>first</u> <u>identified</u>.  The Court cautions the parties to pay attention

19 to this detail so that all concerned, including the jury, will not be confused by one exhibit

20 being identified with both a number and a letter.

21    A.    No other exhibits will be permitted to be introduced unless:

22    (1)    The party proffering the exhibit demonstrates that the exhibit is for

23 the purpose of rebutting evidence which could not be reasonably anticipated at the

24 Pretrial Scheduling Conference, or

25    (2)    The exhibit was discovered after the Pretrial Scheduling Conference

26 and the proffering party makes the showing required in paragraph "B", below.

27    B.    Upon the post-pretrial discovery of exhibits, the attorneys shall promptly

28 inform the Court and opposing counsel of the existence of such exhibits so that the

1  Court may consider at trial their admissibility.  The exhibits will not be received unless

2  the proffering party demonstrates:

3         (1)    The exhibits could not reasonably have been discovered prior to

4  pretrial;

5         (2)    The Court and counsel were promptly informed of their existence;

6         (3)    Counsel forwarded a copy of the exhibit(s) (if physically possible) to

7  opposing counsel.  If the exhibit(s) may not be copied, the proffering counsel must show

8  that he has made the exhibit(s) reasonably available for inspection by opposing counsel.

9      C.    As to each exhibit, each party is ordered to exchange a copy identical to

10  the Court's copy, or other reproduction of the exhibit(s) in a three-ring binder(s) by

11  **February 18, 2014**.  The attorney or representative for each party is directed to present

12  the original and two (2) copies of the exhibit(s) and exhibit list to the Court Clerk's Office,

13  no later than **3:00 p.m., February 18, 2014**, or at such earlier time as may be ordered by

14  the Court.  **NO EXCEPTIONS.**

15      D.    **The Court shall be presented with a copy of the exhibit(s) in a 3-ring**

16  **binder(s) with a side tab identifying each exhibit by number or letter.  Each binder**

17  **shall be no larger than three inches in width and have an identification label on the**

18  **front and side panel.**

19  VII.   DISCOVERY DOCUMENTS

20      A.    Filing Depositions.  It is the duty of counsel to ensure that any deposition

21  which is to be used at trial has been lodged with the Clerk of the Court.  In addition, two

22  unmarked copies of the transcripts must be delivered to the Court Clerk's Office.

23  Counsel are cautioned that a failure to discharge this duty may result in the Court

24  precluding use of the deposition or imposition of such other sanctions as the Court

25  deems appropriate.

26  ///

27  ///

28  ///

1    B.    Use of Depositions.  The parties are ordered to file with the Court and

2  exchange between themselves by **February 18, 2014** a statement designating portions

3  of depositions intended to be offered or read into evidence (except for portions to be

4  used only for impeachment or rebuttal).

5    C.    Interrogatories.  The parties are ordered to file with the Court and

6  exchange between themselves by **February 18, 2014** the portions of Answers to

7  Interrogatories which the respective parties intend to offer or read into evidence at the

8  trial (except portions to be used only for impeachment or rebuttal).

9  VIII.   FURTHER DISCOVERY OR MOTIONS

10    Pursuant to the Court's Pretrial Scheduling Order, all discovery and law and

11  motion was to have been conducted so as to be completed as of the date of the Final

12  Pretrial Conference.  That Order is confirmed.  The parties are free to engage in informal

13  agreements regarding discovery and law and motion matters.  However, any such

14  agreements will not be enforceable in this Court.

15  IX.   AGREED STATEMENTS - JOINT STATEMENT OF CASE

16    It is mandatory the parties shall file a short, jointly-prepared statement concerning

17  the nature of this case that will be read to the jury at the commencement of trial (**NO**

18  **EXCEPTIONS**).  The joint statement of the case shall include in plain concise language

19  the claims of and claims of other parties, if any, and the corresponding to the claims.

20  The purpose of the joint statement of the case is to inform the jury at the outset, what the

21  case is about.  The statement must be filed with the Court by **February 18, 2014**.

22  X.   PROPOSED JURY INSTRUCTIONS, VOIR DIRE, VERDICT FORM

23    A.    Jury instructions

24    Counsel are directed to meet and confer and to attempt to agree upon a

25  joint set of jury instructions.  Counsel shall use the Ninth Circuit Model Jury Instructions

26  and any revisions.  Alternate instruction or authority may only be used if a Ninth Circuit

27  ///

28  ///

1    Model Jury Instruction is unavailable.  Attached for counsel's review are the opening and

2    closing instructions for your use.  The joint set of instructions must be filed by

3    **February 18, 2014** and shall be identified as the "Jury Instructions Without Objection."

4         All instructions shall be, to the extent possible, concise, understandable, and free

5    from argument.  See Local Rule 163(c).  Parties shall also note that any modifications of

6    instructions from statutory authority, case law or from any form of pattern instructions

7    must specifically state the modification by underlining additions and bracketing deletions.

8         B.    Verdict Form

9         The parties must file a joint verdict form(s) concurrently with proposed jury

10   instructions by **February 18, 2014**.  If necessary, a special verdict or interrogatories shall

11   be included for all factual disputes submitted to the jury that must be resolved before

12   questions of law can be decided, and for any other issue on which specific responses

13   are desired.  See Local Rule 163(e).

14        C.    Voir Dire

15        The parties shall submit proposed voir dire questions to the Court.  The Court

16   reserves the right to conduct all examination of prospective jurors.  Notwithstanding this

17   reservation, the Court will permit each side up to ten (10) minutes to conduct voir dire, if

18   desired.  The voir dire questions shall be filed with the Court by **February 18, 2014** .

19        D.    Submission of Documents to the Court

20        At the time of filing their respective proposed jury instructions, verdict form(s), and

21   voir dire questions, counsel shall also electronically mail to the Court in digital format and

22   compatible with Microsoft Word, the proposed jury instructions and verdict form(s).

23   **These documents should be sent to mceorders@caed.uscourts.gov.**

24   XI.   AUDIO/VISUAL EQUIPMENT

25        The parties are required to **file electronically** a joint request to the Courtroom

26   Deputy Clerk, Stephanie Deutsch, by **February 10, 2014** if they wish to reserve and

27   arrange for orientation with all parties on the Court's mobile audio/visual equipment for

28   presentation of evidence.  There will be one date and time for such orientation.

1  XII.  DATE AND LENGTH OF TRIAL

2        A trial is scheduled for **March 3, 2014** .  The estimated length of trial is **five (5)**

3  **days.**  The trial will consist of **eight (8) jurors.**  Counsel are to email Stephanie Deutsch,

4  Courtroom Deputy Clerk, at mceorders@caed.uscourts.gov, or call at (916) 930-4207,

5  by **February 18, 2014** to ascertain the status of the trial date.

6        The Court will permit each side up to one (1) hour for closing arguments.

7  Plaintiffs will be permitted to reserve time for rebuttal purposes but will be required to

8  monitor any time so reserved.

9  XIII.  OBJECTIONS TO PRETRIAL ORDER

10        Each party is granted five (5) court days from the date of this Final Pretrial Order

11  to object to any part of the order or to request augmentation to it.  A Final Pretrial Order

12  will be modified only upon a showing of manifest injustice.  If no objection or

13  modifications are made, this Order will become final without further order of the Court

14  and shall control the subsequent course of the action, pursuant to Rule 16(e) of the

15  Federal Rules of Civil Procedure.

16        IT IS SO ORDERED.

17  Dated:  February 6, 2014

18

19

20                                    _____

21                                    MORRISON C. ENGLAND, JR., CHIEF JUDGE
                                      UNITED STATES DISTRICT COURT

22

23

24

25

26

27

28